Braum, to use, Appellant, *v.* Potter Title and Trust Co.

Argued March 19, 1930.   Before Moschzisker, C. J., Frazer, Walling, Simpson, Sadler and Schaffer, JJ.

*H. P. Eberharter,* with him *Joseph M. Friedman* and *Leo I. Shapiro,* for appellant.—The court below should not have permitted defendants to introduce oral testimony to contradict the terms of the written and duly recorded bond and mortgage, the pleadings of defendants having contained no averment of either fraud, accident or mistake: Shickshinny Nat. Bank v. Tustin, 246 Pa. 151; Crelier v. Mackey, 243 Pa. 363; Sutcliffe v. Bakes, 62 Pa. Superior Ct. 65; Wodock v. Robinson, 148 Pa. 503; General Motors T. Co. v. Paving Co., 248 Pa. 499; Lowry v. Roy, 238 Pa. 9; Hunter v. McHose, 100 Pa. 38; Krueger v. Nicola, 205 Pa. 38.

Further, defendants were clearly disqualified from testifying under the provisions of section 5 of Act of May 28, 1887, P. L. 158, as they were testifying adversely to the interests of a deceased person, to wit, the deceased assignor: Bates v. Construction Co., 255 Pa. 200; Naugel's Est., 83 Pa. Superior Ct. 41.

Where parol evidence of witnesses seeking to set aside the terms of a bond and mortgage is not clear, precise and indubitable, the witnesses not having the same recollection of the conversations which took place, the court should direct the jury to find for plaintiff. When the jury in such a case finds for defendants, the court should award to plaintiff judgment non obstante veredicto: Lowry v. Roy, 238 Pa. 9; Burt v. Burt, 221 Pa. 171; Cullmans v. Lindsay, 114 Pa. 166; Ott v. Oyer, 106 Pa. 6; Boyertown Nat. Bank v. Hartman, 147 Pa. 558; Fox v. Boorse, 81 Pa. Superior Ct. 211; Michael v. Stuber, 73 Pa. Superior Ct. 390; Wilson v. Police Beneficial, 266 Pa. 317; Bonistalli v. Bonistalli, 269 Pa. 8;

Kavalkovich v. Order of Liberty, 75 Pa. Superior Ct. 328; Wilson v. Mitchell, 101 Pa. 495.

A contract whereby parents for a consideration undertake to induce their daughter to consent to a marriage, is a marriage brokerage contract and consequently null and void: Packerman v. Shuster, 12 Pa. D. & C. 717; Crawford v. Russell, 62 Barbour (N. Y.) 92; Morrison v. Rogers, 115 Cal. 252.

A contract founded on the consent of parents to a marriage of their minor child in consideration of their personal gain is against public policy: Duke of Hamilton v. Lord Mohun, 1 P. Wms. 118; Keat v. Allen, 2 Vernon 588.

*Franklin A. Ammon* and *Louis L. Kaufman,* for appellees.—In the case at bar, the minor daughter had absolutely no estate whatever. The bond and mortgage were owned by August Braum, and his legal right to make an agreement or contract thereto with the parents of the girl are absolute, and more especially when the consideration is marriage, consent of the parents to the marriage, forbearance to foreclose, loss of earnings of the minor daughter sustained by the parents.

The courts should not lend their aid to one who is, in effect, attempting to recover that which has been paid or performed in an executed illegal contract.

The following authorities decide the case in our favor: Bredin's App., 92 Pa. 241; Ham v. Smith, 87 Pa. 63; Barr v. Hill, Addison 276; Hunt's App., 100 Pa. 590; Krug's Est., 196 Pa. 484; Gackenback v. Brouse, 4 W. & S. 546; Smith's App., 115 Pa. 319; Turner v. Warren, 160 Pa. 336.

OPINION BY MR. JUSTICE SIMPSON, November 24, 1930:

When they were married, plaintiff was fifteen years old and her husband seventy-one. On their marriage day, he assigned to her a bond and mortgage for $6,475, secured upon a property owned by her parents, who are

the present defendants. After she became of age, plaintiff caused a judgment to be entered on the bond, and levied on the property described in the mortgage. Defendants thereupon obtained a rule to show cause why the judgment should not be opened and the execution set aside, specifying in their petition, as the reason for this action, that "Prior to said marriage August Braum [plaintiff's husband, who assigned the mortgage to her] was a frequent visitor at the home of defendants constantly seeking to unite himself in marriage with their daughter, Gertrude, he at that time being of the age of seventy-one years and she being of the age of fifteen years. For a long period of time defendants, parents of said Gertrude, refused to consent to said marriage, but after various consultations on this subject, the said August Braum......and the defendants herein, agreed that the legal consent would be given and the defendants would allow the said marriage to be consummated under the following antenuptial contract entered into orally by said parties: The said recited mortgage upon the domicile of defendants was at no time during the lifetime of the defendants, or either of them, to be collected, nor were the mortgagors, the defendants, obligated to pay any principal or interest thereon whatsoever; that the defendants hereto, the mortgagors, should enjoy their domicile, the mortgaged premises, clear of any lien or encumbrance created by said mortgage."

Defendants having testified to that effect, the rule was made absolute, and, upon the trial of the issue thus raised, the jury were told that, if they found the facts to be as stated in the petition, they should render a verdict for defendants. This they did, and the court below subsequently dismissed plaintiff's motion for judgment non obstante veredicto, and entered an order "that the amount of the judgment be reduced to $6,475, without interest thereon, with attorney's commission of five per cent, and that execution be stayed during the lifetime of the defendants and the survivor of them, when the prin-

cipal and attorney's commission, without interest, became due." Plaintiff appeals.

In its opinion dismissing plaintiff's motion, the court below said: "The plain fact is that these defendants gave or sold their daughter to the old man while she was still a child. The situation is abhorrent to decent sensibilities. Nevertheless, we are unable to say that the agreement, if proved, rested upon an illegal consideration or one contrary to public policy." We are in full accord with the court's characterization of the transaction, but do not agree with its conclusion. Instead of such a contract being enforceable, it was and is wholly and irremediably tainted, incapable of supporting an action or defense.

Among many savage peoples it always has been and still is the custom for a father to bargain for the sale of his female child, the highest bidder becoming the successful suitor. This is also the custom among the ignorant inhabitants of other and less advanced lands, and we are told that the emigrants from those countries, while resident in this State, to some extent still wrongfully follow that custom, though it is illegal here. In countries subject to the civil law, contracts made by matchmakers, known as proxenetæ, are still sustained to a limited extent (1 Story Eq. Jur. (14th ed.), section 371), apparently on the theory that to "increase and multiply in the land" is of paramount importance to the State. Story intimates also (Ibid., section 373) that, in early days, this was true under the "narrow, cold and semibarbarous dogmas of the common law" also; but, if so, it was finally overthrown in 1695, so far as the common law is concerned, by the decision in Hall and Keene v. Potter, 3 Levinz 412. There the House of Lords, with but three or four dissenting votes, held that bonds and contracts for procuring marriages are wholly void. That principle, so far as we are aware, has never been distinguished, doubted or overruled, either in England or in America north of the Mexican border, but has been

many times reaffirmed, no matter under what circumstances the question has arisen.

When the point with which we are more directly concerned first came up for consideration, the principle stated in Hall and Keene v. Potter was unhesitatingly applied. In Keat v. Allen, 2 Vernon 588 (1707), plaintiff "was obliged by the defendant, in order to obtain his consent to his daughter's marriage, to give bond to pay the defendant £200" in case specified contingencies arose, which they afterwards did. The High Court of Chancery decided that the bond was "in the nature of a brocage bond, and decreed it to be delivered up to be cancelled." In Duke of Hamilton v. Lord Mohun, 1 P. Wms. 118 (1710), the leading case on the point, the prospective husband promised the mother of his intended wife—the mother being also the guardian of her daughter, and having a claim against her daughter for a greater sum than the value of the estate—that, if she would consent to the marriage, he would release to her all his claim to an accounting of the mesne profits on the daughter's estate, to which, as the law then stood, he would have been entitled, by virtue of the marriage. She consented, the marriage was solemnized, and he filed a bill in chancery to have the agreement declared void. The court so decreed, Lord COWPER saying, at page 120: "That it was as if the mother should say, you shall not have my daughter unless you will release all accounts...... This agreement was within the same reason as a marriage brokerage agreement, which had been so often condemned in equity...... To tolerate such an agreement, would be paving a way to guardians to sell infants under their wardship." This conclusion has stood the test of time also, and has never been successfully questioned either in this country or in England.

It is unnecessary to attempt even a brief résumé of the numerous cases supporting the principle above stated, or to quote from the textbooks which unanimously ap-

prove it. He who wishes to investigate the subject further, will find many of the authorities cited in Greenhood on Public Policy 478; 1 Story on Contracts (5th ed., by Bigelow), section 694; Willard's Eq. Jur. 210-11; 1 Maddock's Ch. Pr. 231-3; 1 Fonblanque's Eq., bk. 1, ch. 4, section 10, and 13 Corpus Juris 463. Perhaps we should add, however, that, so universal is the rule, it makes no difference whether or not the intended marriage is between persons of equal rank, fortune and age, and is entirely proper and expedient (1 Story Eq. Jur. (14th ed.), sections 374, 375); or that the contract was simply to hasten an intended marriage, between parties who were already engaged to marry: Morrison v. Rogers, 115 Cal. 252; Jangraw v. Perkins, 76 Vt. 127.

In a number of the cases above referred to, all the parties interested were sui juris. If such contracts were void under those circumstances, as it was held they were, a fortiori they must be so when made as regards one legally incompetent to consent or to contract. It is unthinkable that the courts would compel a parent or guardian, as they always do, to refund any sum, small or great, which he obtained while acting for a minor in a business matter, yet would permit him to retain, for his own use and to the detriment of the minor, that which he received for consenting to the sale of the minor's person and happiness, ostensibly for the period of the minor's life.

Not only is the conclusion reached in those cases right in morals, but it is, moreover, in accord with the legislation and jurisprudence of this State. By the Act of February 14, 1730, 1 Sm. L. 180, the marriage of a minor without the "consent of the parent or parents, guardian or guardians" is expressly forbidden, and it is further provided that "every justice of the peace, clergyman, minister or other person offending [against the act], shall, for every such offense, forfeit the sum of £50." That enactment was amended and supplemented from time to time, and was finally repealed by the Act

of April 17, 1913, P. L. 93, because its essential provisions appeared in later statutes. The one in force when the marriage of plaintiff was solemnized, was the Act of May 28, 1915, P. L. 636, which provides that "If any of the persons intending to marry by virtue of such [marriage] license shall be under twenty-one years of age, the consent of their parents or guardians shall be personally given before such clerk [of court]...... When any such minor has no guardian, and the judge of the orphans' court is absent or not accessible, for any reason, the clerk of the orphan's court, or a duly appointed assistant clerk of that court, may appoint for such minor a guardian pro hac vice." These statutes, and the others bearing date between the two, show that for two centuries the public policy of this State has been, as it still is, to require adult consent before the marriage of a minor, and the reason for this is not far to seek. "Marriage is not a mere personal relation, but a public institution, on the purity and integrity of which the welfare of society depends": English v. English, 19 Pa. Superior Ct. 586, 599, per RICE, P. J. Because of this, the courts have always steadily borne in mind in divorce proceedings "the well recognized principle, often expressed in the words, 'The Commonwealth is always the unnamed third party to the proceeding' ": Ibid. 598.

In relation to her citizens, it is impossible to think of anything more vital to the Commonwealth than proper consideration being given before marriages are solemnized. The happiness of the parties, the continuity of the relation thus created, the sanctity of the home and the healthfulness and happiness of offspring, all depend on the fitness of the marriage. This being so, it is clear that the consent required to be obtained before the marriage of a minor can be selemnized, must be given solely from a consideration of the advantage thereof to the minor, untainted by selfish motives on the part of the consenting parents, guardians or court appointees, and uninfluenced by anything of value given or promised to

be given to them. All such gifts and promises are made expressly for the purpose of inducing the recipient to look favorably upon the desire of the giver, rather than upon the welfare of the minor; and it is equally true that they usually have that effect. From such a possibility there is no safety for the helpless minor, save by absolutely removing all hope of gain by the consenting parent, guardian or court appointee, and this the common law does, as we have already shown, by declaring that every such promise shall be wholly void.

Appellees expressly recognize the public policy to which we have adverted, and its usual effect in this class of cases; but assert that it does not apply to executed contracts, and apparently contend that the one, upon which they rely, was of that character, because plaintiff was actually married and the mortgage was actually assigned to her, as the contract provided. While an exception in favor of executed contracts is sometimes wisely made, it has no application where, as here, it violates a great principle of public policy. Forehandedness in obtaining the consideration promised is of no moment under such circumstances: 1 Story on Contracts (5th ed., by Bigelow), section 694; 1 Story's Eq. Jur. (14th ed.), section 374. Moreover, this is not an executed contract within the purview of the rule relied on, for it has not been wholly executed; indeed, despite its illegal character, defendants are now asking to have the unexecuted part enforced by an order of court, releasing them from their covenant to pay the principal and interest of the bond and mortgage in suit. In other words, defendants are seeking to use the illegal contract as a means of defense against the lawful and entirely distinct covenant, embodied in the bond and mortgage before the illegal contract was thought of, and against a person not in pari delicto with them. Indeed, the illegal agreement itself contains no promise to assign the mortgage to plaintiff, and, if it did, the motive of plaintiff's husband in so promising would be of no moment, the assign-

ment being lawful, and, as between her and her husband, having ample consideration to support it. So far as we are concerned, therefore, plaintiff lawfully acquired a lawful obligation, and seeks to enforce it in a lawful way. No illegal contract will be permitted to interfere with her in so doing,—a fortiori one will not, to which she was not a party, and which resulted in grievously wronging her. Neither at law nor in equity is this allowable: 13 C. J. 493, 496, and the multitude of cases cited therein.

The original judgment entered by plaintiff against defendants is now reinstated; and the order of the court below opening it, and the judgment entered on the trial of the issue thereby raised, are reversed and set aside.