[No. 28221. *En Banc.* July 3, 1941.]

C. H. SHERMAN, *by his Attorney in Fact, C. E. Claypool,*
*Appellant,* v. EARL MILLIKIN, *Individually and as*
*Auditor of King County, Respondent.*[1]

*C. E. Claypool* and *Karl H. Kober,* for appellant.

*B. Gray Warner* and *Lloyd W. Shorett,* for respondent.

BLAKE, J.—This action was brought, pursuant to the provisions of § 7, chapter 204, Laws of 1939, p. 717 (Rem. Rev. Stat. (Sup.), § 8450-6 [P. C. § 3716-27]), to compel the defendant, Millikin, who is county auditor of King county, to issue a marriage license to C. E. Claypool as attorney in fact for C. H. Sherman. The latter had, on March 30, 1940, applied for a marriage license in accordance with the requirements of § 4, p.

[1] Reported in 114 P. (2d) 989.

716 (Rem. Rev. Stat. (Sup.), § 8450-3 [P. C. § 3716-24]), of the act referred to.

By the terms of the act (§ 6, p. 717, Rem. Rev. Stat. (Sup.), § 8450-5 [P. C. § 3716-26]), he was not entitled to receive a marriage license "until the third full day following the filing of such application . . ." In the meantime (April 1st), he executed a power of attorney to C. E. Claypool, a justice of the peace, authorizing the latter "To DEMAND AND RECEIVE said license on the date the same may be lawfully delivered . . ." April 3rd, Claypool presented the power of attorney to defendant and made a demand, with which defendant refused to comply, for the marriage license. Thereupon, the complaint in this action was filed, and a show cause order was directed to the auditor pursuant to the terms of § 7 of the act. In response to the show cause order, the auditor appeared and filed an answer, alleging, among other things:

" . . . that experience has proven that one of the contracting parties [applicants for a marriage license] may authorize a Justice of the Peace . . . to receive his marriage license and may later decide to have a Church wedding and thereafter demand his license from the County Auditor. This results in considerable confusion and perhaps delay to the contracting parties because their receipt for a license may not be readily obtainable from the Justice of the Peace or his agent."

Upon the issue so presented, the cause came on for trial, the plaintiff resting his complaint solely upon the facts admitted: The application for the license, the authenticity of the power of attorney, and the demand made for delivery of the marriage license by the attorney in fact after the expiration of three full days. In other words, plaintiff's case is rested upon the principle that what one may do himself, he may lawfully delegate to an agent.

Defendant, upon the theory that the situation presented calls for the application of a well-recognized exception to that rule, submitted evidence, in substance, as follows: That, after the Laws of 1939, chapter 204, p. 716 (Rem. Rev. Stat. (Sup.), § 8450-1 [P. C. § 3716-22] *et seq.*), became effective, he adopted the ·practice of issuing a "deliver to bearer" receipt to applicants for a marriage license; that many of such receipts were turned over to one Whittig, "a marriage license runner . . . who patrols the hall outside of the marriage license bureau"; that, in several instances, the license did not reach the contracting parties at the proper time; that, in many cases, the principals would conclude that they wanted a religious, instead of a civil, ceremony, and would experience difficulty in procuring their license from the "marriage license runner" or from a justice of the peace who had procured it through a power of attorney; that, in one case, when a license was delivered to the "marriage license runner," it "could not be found at the time of the wedding and was finally located in a drawer of the clerk in the office of one of the Justices of the Peace in the County-City Building."

After hearing the evidence, the trial court entered a decree dismissing the action. Plaintiff appeals.

Appellant contends that all the evidence admitted was irrelevant and immaterial, and, therefore, should be disregarded.

The soundness of this contention depends upon whether this is a case for the application of the general rule that whatever one may lawfully do for himself, he may lawfully authorize an agent to do for him. Mechem on Agency (2d ed.), 48, § 80; 2 C. J. 431, § 24. There are several well-recognized exceptions to the general rule, one of which is that the attempted delegation of

power to perform the act may be against public policy. Mechem on Agency (2d ed.), 48, § 82. If it is, the court will not countenance it. In § 84, the author says:

"Pursuing this general principle more fully into details, it may be further said that the law scrutinizes undertakings of this nature with great strictness, and judges of their validity by their general character and their natural and probable results. It makes no difference in many instances, that in the particular case nothing improper was done or intended to be done. The law seeks to prevent, not only the evil itself, but the very temptation to evil. It concerns itself rather with the public weal than with individual interest. The law therefore ordinarily determines the case by the tendency of undertakings of that kind, and holds the particular contract unlawful if its general nature brings it within the prohibited class. It refuses, ordinarily, to assist either party, but leaves them both in the situation in which their own cupidity has placed them."

We think the power of attorney under consideration falls within this category. It is akin to marriage brokerage contracts, which are universally held to be against public policy. See *Braum v. Potter Title & Trust Co.*, 301 Pa. 365, 152 Atl. 751, 72 A. L. R. 1109, and Annotation p. 1113.

While marriage, in legal concept, is a contractual relationship which may be consummated by an informal ceremony before a judge or a justice of the peace, it carries much greater significance than that in social concept. It is a religious rite. We are of the opinion that any intermeddling which tends to thwart its observance and consummation, as such, is against public policy. Since the power of attorney in this instance tends to that end, the court will not lend aid to effectuate its purpose.

Judgment affirmed.

MAIN, MILLARD, and STEINERT, JJ., concur.

ROBINSON, C. J. (concurring in the result)—I am willing to subscribe to the result of the foregoing opinion, but not to the reasoning by which the result is arrived at.

The case is simply this: At a time when the respondent auditor of King county had in his possession a legal document to which it is undisputed C. H. Sherman had become fully entitled, Judge C. E. Claypool presented a power of attorney, duly executed by Sherman, authorizing him to receive the document on Sherman's behalf. The respondent auditor refused to recognize or honor the power of attorney. This action was brought to compel the auditor to deliver the document to Judge Claypool, Sherman's legal attorney in fact.

The document was a marriage license, and, since this was so, the majority sustain the auditor's refusal to deliver the document upon the following grounds: It is first pointed out that courts will not enforce contracts which are manifestly evil in tendency, even though there be no proof of actual evil in the particular case. This is a sound and familiar rule. It is then said:

"We think the power of attorney under consideration falls within this category. It is akin to marriage brokerage contracts, which are universally held to be against public policy."

But if the power of attorney can properly be regarded as a contract, it would seem that no evil tendency can be found to inhere in a mere agreement that one shall go to a public office and as attorney in fact for another receive a marriage license to the possession of which his principal is entitled. The majority, in making the statement above quoted, must, I think, have had some other contract subconsciously in mind.

It was repeatedly stated in argument—although I

recall no actual proof in the record—that appellant had made some arrangement or contract with Judge Claypool that he should perform the marriage ceremony which the license authorized to be performed. Let us assume that such a contract was in fact made. Judge Claypool is a justice of the peace. Rem. Rev. Stat., § 8441, provides:

"The following named officers and persons are hereby authorized to solemnize marriages, to wit: judges of the supreme court, judges of the superior courts, any regularly licensed or ordained minister or any priest of any church or religious denomination anywhere within the state, and justices of the peace within their respective counties."

Since Judge Claypool had the full statutory right to perform the marriage ceremony in King county, he had the right to promise to do so, and, since Sherman clearly had the right to select and employ any qualified person to perform that service for him, I cannot see how such a contract can be regarded as being inherently evil in tendency.

It was further assumed during the argument of the cause—and I use the word "assumed" advisedly—that a consideration for performing the marriage ceremony was stipulated for or at least implied. If so, did that of itself convert an otherwise innocent agreement into one manifestly evil in tendency? To so hold, it seems to me, would be to cast an undeserved and unwarranted imputation upon the hundreds of ministers of the gospel who customarily charge fees for performing marriage services. I cannot concede that in so doing they are engaged in evil transactions or violating public policy.

I think, however, that the result may be sustained upon other grounds. The official duty and responsibility of issuing marriage licenses is imposed upon the auditor by statute. Is not the delivery thereof so far

a component part of the issuance as to be subject to his reasonable regulation and discretionary control? It is clearly his duty to issue such licenses to the parties entitled thereto. He may have reasonably concluded that his official duty in this regard could be best performed by refusing to assume the risk and burden of passing upon the validity and legal sufficiency of written powers of attorney. To compel him to do so by court order would seem to constitute an unwarranted interference with discretionary power.

JEFFERS and DRIVER, JJ., concur with ROBINSON, C. J.

BEALS, J. (concurring in the result)—This action is, in effect, an application for a writ of mandate directed to the county auditor. In my opinion, that official, in recognizing or refusing to honor such a power of attorney as that with which we are here concerned, exercises an official discretion which will not be controlled by judicial order, save for wanton abuse.

No abuse of discretion appears here, and I therefore concur in the result reached by the majority.

SIMPSON, J. (dissenting)—The complaint in this action recited that, March 30, 1940, the plaintiff and his intended wife applied for a marriage license and were issued a "will call receipt"; that, April 2, 1940, plaintiff was entitled to receive a license to wed; that, March 30, 1940, the plaintiff by an instrument in writing made and constituted C. E. Claypool his attorney in fact to receive the license; and that, April 3, 1940, the attorney in fact presented the receipt and power of attorney to the auditor and demanded the license which was refused. The answer admitted the facts to which I have just referred, and then set up the defense as stated in the majority opinion. The evidence substantiated the allegations made by each party.

The facts alleged and proven by respondent did not constitute a defense to the action. Admitting *arguendo* that a situation exists such as shown by respondent, it is clear to me that any evidence relating to that situation was irrelevant and immaterial. It had nothing whatever to do with the rights of appellant to have another secure his license for him. It was neither charged nor proven that Judge Claypool was a "marriage license runner," and there was no proof that he had anything to do with the situation of which respondent complains.

This case concerns the right of but one person, the appellant. The condition brought about by other parties was not of his making and he should not have his rights affected thereby.

The duties and powers of county auditors are defined by statute. Nowhere have they been given the rule-making power. The act, Rem. Rev. Stat. (Sup.), §§ 8450-1, 8450-6, Laws of 1939, chapter 204, p. 716, gives to the county auditor the right to refuse a license if

" . . . in his discretion, the applications executed by the parties or information coming to his knowledge as a result of the execution of said applications, justifies said refusal."

That discretion relates to the merits of the application and has nothing whatever to do with the delivery of the license when issued. After a county auditor has exercised his discretion allowed by the act, he must perform the ministerial duty of delivering the license to the parties named in the license or their duly authorized agent.

The judgment should be reversed.