STATE OF MARYLAND *v.* ANNA L. CLAY

[No. 2, January Term, 1944.]

640

Decided *February 2, 1944.*

The cause was argued before SLOAN, C, J., DELA-PLAINE, MARBURY, MELVIN, and BAILEY, JJ.

*William C. Walsh, Attorney General,* and *J. Edgar Harvey, Assistant Attorney General,* with whom were *Hall Hammond, Deputy Attorney General,* and *Henry L. Constable, State's Attorney for Cecil County,* on the brief, for the appellant.

*William J. Bratton,* with whom was *Edward D. E. Rollins* on the brief, for the appellee.

SLOAN, C. J., delivered the opinion of the Court.

This appeal by the State of Maryland seeks the reversal of an order of the Circuit Court for Cecil County granting the writ of *certiorari* to the appellee, who had been arrested on a warrant charging her with the violation of Chapter 532 of the Acts of 1943, Code, 1943 Supp., Art. 27, Sec. 444A.

The Act, the validity of which the appellee questions, under the title, "Marrying Unlawfully," reads: "It shall be unlawful for any person, firm or corporation to construct, erect or maintain billboards or other structures,

signs, posters or display advertising of any kind whatsoever, either as separate structures or otherwise, or information booths or any other structures, any one or more of which is intended to aid in the solicitation or performance of marriages," and then follow the penalties.

The petitioner, appellee, charges that the Act "is not essential to the protection of the public order, health, safety or morals," is arbitrary and oppressive, will deprive her of her property without due process of law, and is contrary to the law of the land, deprives her of the lawful use of her property, denies her the pursuit of her calling (nothing to indicate what that is) without due process of law; that the Act "if permitted to be enforced, will deny to all persons engaged in soliciting or performing marriages the equal protection of the laws"; that it will deny the petitioner the equal protection of the laws, intimating, of course, that some may violate the Act and some may not. "That said Act is inexplicable and altogether absurd, and should, therefore, be declared void, apart from any constitutional objection thereto." It is not the province of the courts to denounce, as invalid, an Act of Assembly merely because it is inexplicable or absurd.

The court below held the Act to be an abridgement of the free use of property and is not such an exercise of the police power as may be referable to the public order, security, health or morals.

It is axiomatic that an Act of Assembly should be sustained unless it clearly violates some provision of the State or Federal Constitutions, and that all reasonable doubts should be resolved in its favor. *McGlaughlin v. Warfield*, 180 Md. 75, 23 A. 2d 12; *Woelfel v. State*, 177 Md. 494, 9 A. 2d. 826; *Jones v. Gordy*, 169 Md. 173, 180 A. 272; *Swann v. Board of Police Com'rs for Baltimore City*, 132 Md. 256, 103 A. 441.

If the question here presented makes the statute a violation of any property or personal right, without due process, then the decision of the lower court was right.

If the statute is a proper regulation pertaining to the marriage rite in this State, then the decision was wrong.

It is settled that each and every State may ordain by statute its own regulations and requirements for marriage. In some States, common law marriages are recognized, usually by judicial decree, but in Maryland, they are not. Co-habitation does not make marriages legal here. In Maryland the marriage institution is treated as sacred and must be by a religious ceremony; such is the public policy of the State, as declared by its Legislature by statute. A review of these statutes is essential to a decision of this case.

Section 2, Article 62 of the Code, 1939, prohibits marriages within certain relationships, some not of the blood of parties. By Section 4, it is provided that, "The following persons are authorized to solemnize marriages in this State; any minister of the Gospel, or official of a religious order or body authorized by the rules and customs of said order or body to join persons in marriage," and "No person within this State shall be joined in marriage until a license shall have been obtained from the Clerk of the Circuit Court for the county in which the marriage is to be performed, or if in Baltimore City, from the Clerk of the Court of Common Pleas." Then follows the form of license to be issued by the Clerk with the certificate to be returned by the one performing the ceremony to the clerk within thirty days from the date of the marriage, or be subject to the penalty of Section 13. But before the clerk can issue any license, he shall examine one of the contracting parties (Sec. 5), under pain of perjury. *State v. Floto,* 81 Md. 600, 601, 32 A. 315.

Some adjoining States from time to time passed marriage statutes in some respects more drastic than those of this State, and many of our county seats, particularly along the northern border, became Gretna Greens. The increase in the number of persons coming into Maryland developed a commercial aspect, and some hotel porters and cab drivers who infested the railroad and bus stations, and so-called ministers of the gospel who

were not as ethical as they should have been, developed a thriving business centering in many of our county seats, and particularly Elkton, county seat of Cecil County, on account of its more favorable location, in much undesirable publicity. It was the practice of such ministers to divide their fees with the porter or cab driver who took them the business. If they refused to divide, the ministers were soon out of the wedding business. Elkton is located on one of the country's most traveled roads, intersected at or near that town by many important roads. The thousands of persons who travel these roads every day are greeted by very conspicuous signs. On all of them in very large letters are the words, "Marriage Licenses" and below in small inconspicuous letters, hardly legible from the roads, the word "Information." This in itself is a fraud on the public, not compatible with the ministerial calling, and not practiced by any respectable minister.

None of this appears in the record, but, in our opinion, is a matter of which we can and should take judicial notice, and we think there is ample authority for it in this State and elsewhere. *Wirgman's Adm'rs v. Maclier,* 1 Gill & J. 150; *State v. Price,* 12 Gill & J. 260, 37 Am. Dec. 81; *McCaddin v. McCaddin,* 116 Md. 567, 571, 82 A. 554; *State v. Shapiro,* 131 Md. 168, 174, 101 A. 703; *Philadelphia, B. & W. R. Co. v. Diffendal,* 109 Md. 494, 510, 72 A. 193, 458; *American Syrup & Preserving Co. v. Roberts,* 112 Md. 18, 24, 76 A. 589; *King v. Kaiser,* 126 Md. 213, 217, 94 A. 780: "The classes of facts of which judicial notice will be taken are judicial, legislative, political, historical, geographical, scientific and artistic, in addition to a wide range of matters arising in the ordinary course of nature or the general current of human affairs which rest entirely upon acknowledged notoriety for their claims to judicial recognition." *Bouvier's Law Dictionary,* Rawle's Third Revision, p. 1734.

This all brought to many county seats much unpleasant and undesirable notoriety. Ministerial associations passed resolutions against it and made investigations and news-

papers inveighed against it, but all without effect. The offending ministers did not, and could not, belong to the ministerial associations, and the porters and the taxicab drivers did not care so long as they got the business. The first step the Legislature took to correct the evil, and it was an evil, was the passage of the Act of 1922, Chap. 110, Sec. 329A, Code, 1939, Art. 27, Sec. 444, which reads: "It shall be unlawful for any minister of the Gospel, or other person who, under the laws of the State of Maryland, is now or may hereafter be authorized to perform the marriage ceremony, to give either directly or indirectly, or offer to give any money, present or reward, to any hotel or railroad porter, or to any other person or persons, as an inducement to said hotel or railroad porter, or other person or persons, to bring, take or direct any person or persons contemplating matrimony to said minister of the Gospel or other person so authorized to perform said rite or ceremony. Any person or persons violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than ten dollars nor more than fifty dollars for each offense."

The passage of the Act of 1922 had no effect on the activities of the marriage ministers, porters, and cab drivers. They ignored it because they had no fear of prosecution. Their customers or victims were from out of the State; and as soon as married, returned to their own domiciles, leaving the State without witnesses or participants aside from the culprits, who knew they were immune without evidence.

The next effort to curb the marriage racket was an amendment of Section 5, Article 62, Act of 1937, Chapter 91, providing a waiting period of forty-eight (48) hours from the time of the application for license and its issuance by the clerk, with the proviso, however, "that any judge of the Circuit Court of the county in which the application is made or, if made in Baltimore City, any judge of the Court of Common Pleas, for good and sufficient cause shown, may, by an order in writing signed

by him" waive the time. The result of this was that the judges of many counties were deluged with requests for waivers, and some were very complaisant and accommodating. At any rate, that Act (1937) lasted only four years, and by the Act of 1941, Chapter 529, Section 5, Article 62, it was further amended by providing that no waiver of the time could be granted by any judge "unless one or both of the contracting parties are * * * residents of Maryland." This was further amended by the Act of 1943, Chapter 718, and the addition of Section 5A, Act of 1943, Chapter 976. By Section 5A the clerk was allowed to waive the time as to soldiers applying for the waiver, and it also provided that applications could only be made during regular office hours. Even this Act did not end the practices, and as a further effort to correct the evil, the Act of 1943, Chapter 532, was passed.

This is not the usual billboard case, many of which are annotated in 74 A. L. R. 400; 72 A. L. R. 465; and 82 A. L. R. 1185, but is a marriage regulation which has always in this State been recognized as of statutory authority. It savors more of an invitation to the promotion of marriage brokerage contracts which have always been held void as against public policy. 35 *Am. Jur., Marriage,* 380; *Braum v. Potter Title & Trust Co.,* 301 Pa. 365, 152 A. 751, 72 A. L. R. 1113.

The purpose of the Act of 1943 as stated in the opinion of the lower court was: "The wisdom of Acts of this character is apparent, to correct an unsavory practice of sign advertising marriage as a business." If the decision had been put on these grounds, it would have been the reverse of what it was and that statement of the lower court is a reason why we think the statute should be upheld, instead of holding it to be an invasion of a property right.

It was argued that the board usually attached to churches, containing the name of the church, days and hours of service, and the name and address of the minister, might be interpreted as an advertisement and viola-

tion of this Act. That is rather far-fetched. If the church or minister, however, would decorate his church with a sign advertising for and soliciting marriages or marriage licenses, it would be a violation of the Act and would subject the offender to punishment.

In our opinion the Act of 1943, Chapter 532, was the proper exercise of legislative power with respect to marriages, and the order appealed from should be reversed.

*Order reversed, with costs, and petition for certiorari dismissed.*