CLERKS OF COURT

MARRIAGE LICENSES – ISSUANCE OF MARRIAGE LICENSES TO
 SAME-SEX COUPLES AFTER APPROVAL OF THE CIVIL
 MARRIAGE PROTECTION ACT

November 29, 2012

*David R. Durfee, Jr.*
*Executive Director*
*Department of Legal Affairs*
*Administrative Office of the Courts*

You have asked for our opinion on a number of questions relating to the implementation of Chapter 2 of the Maryland Laws of 2012, which amended § 2-201 of the Family Law Article ("FL") so as to remove the statutory prohibition of same-sex marriages. Chapter 2 was recently approved by the voters on a referendum and will, therefore, become effective on January 1, 2013—the effective date provided for in the legislation itself. In anticipation of Chapter 2 becoming effective, the clerks of the various circuit courts in Maryland have received and made numerous inquiries about implementation of Chapter 2. You have collected these inquiries and have synthesized them into the following questions, which we have slightly re-phrased:

1. On what date can a clerk begin taking applications for marriage licenses for same-sex marriages?

2. On what date can a clerk begin issuing marriage licenses for same-sex marriages?

3. On what date can a clerk begin delivering issued licenses for same-sex marriages to the parties?

4. If licenses may be issued earlier than January 1, 2013, how do the provisions for the waiting period in FL § 2-405(d)[1] apply to those licenses? For example, would a license issued on December 28, 2012, or earlier take effect at 6:00 a.m. on January 1, 2013, or at 6:00 a.m. on January 3, 2013 (i.e., 6:00 a.m. on the

---

[1] Unless otherwise noted, all statutory references refer to the current version of the Family Law Article reflected in the 2006 Replacement Volume of the Annotated Code of Maryland and the 2012 Supplement.

second calendar day after same-sex marriage became legal)?

5.  If a same-sex couple has already been married in a state where it was legal prior to January 1, 2013, and that marriage remains intact, can they now get a license and marry in Maryland?

6.  To the extent the Attorney General has previously opined or advised that a couple already married cannot get a license, would that conclusion still apply in this situation, where a couple could not previously be married in Maryland, and does Maryland's recognition of out-of-state same-sex marriage affect this determination?

7.  If a couple entered into a "civil union" in a state allowing that contract, and the civil union remains intact, is their marital status Married, Single, or some other status, and can they obtain a license to marry in Maryland?

8.  Should clerks use two sets of vows, one for traditional unions and one for same-sex unions, or should they only use the new vows composed for same-sex unions?  In other words, may clerks' offices offer each couple the opportunity to select from a standard and alternative text (using "spouse" as standard and "husband and wife" as alternative)?

9.  If the clerks may lawfully offer each couple the opportunity to select from a standard and alternative text for their marriage vows (using "spouse" as standard language, and offering "husband and wife" as an alternative), should this option be available to both opposite and same-sex couples?

In light of the volume of inquiries from the clerks and your request that we provide guidance early enough to allow the clerks and the public alike to prepare for Chapter 2 becoming effective, we have addressed your questions on an expedited basis.

# I

## Background

*Same-Sex Marriages Under Maryland Law Before and After Enactment of Chapter 2*

We recently had occasion to describe the history of marriage in Maryland and the treatment of same-sex marriages under Maryland law, *see* 95 *Opinions of the Attorney General* 3 (2010), and do not repeat that description here. For present purposes it suffices to remember that, prior to the enactment of Chapter 2, Maryland law specified that a marriage was between one man and one woman. 57 *Opinions of the Attorney General* 71 (1972). The General Assembly codified that understanding in 1973 with the enactment of § 2-201 of the Family Law Article, which provided that "[o]nly a marriage between a man and a woman is valid in this State." 1973 Md. Laws, ch. 213, *then codified* at Md. Ann. Code art. 62, §1 (1974). The constitutionality of § 2-201 was upheld by the Court of Appeals in *Conaway v. Deane*, 401 Md. 219 (2007).

In 2012, the General Assembly enacted the Civil Marriage Protection Act, which, in relevant part, amends § 2-201 to provide that "[o]nly a marriage between two individuals who are not otherwise prohibited from marrying is valid in this State." 2012 Md. Laws, ch. 2, § 1, *to be codified* at FL § 2-201(b). The Act also made certain conforming changes to the consanguinity provisions of the Family Law to make them gender-neutral and, thus, applicable to spouses of either sex. *Id.*, *to be codified* at FL § 202(b), (c). The clear effect and intent of the 2012 legislation was to authorize same-sex marriages under Maryland law.

The legislation that ultimately became Chapter 2 (House Bill 438) was passed by both houses of the General Assembly and was enacted into law by the Governor's signature on March 1, 2012. A successful petition drive placed Chapter 2 on the ballot as a referendum measure in the 2012 election, which suspended the law pending the voters' approval or rejection at the polls. *See* Md. Const., Art. XVI, § 2; *McGinnis v. Board of Supervisors of Elections*, 244 Md. 65, 69 (1966). The voters ultimately approved the legislation by a reported margin of 52% to 48%. *See* Maryland State Board of Elections, "Unofficial 2012 Presidential General Election Results for All State Questions" (*available at* [http://elections.state.md.us/elections/2012/results/general/gen_qre sults_2012_4_00_1.html](http://elections.state.md.us/elections/2012/results/general/gen_qresults_2012_4_00_1.html) (last visited Nov. 15, 2012)). Assuming the Governor proclaims that Chapter 2 was approved by the voters on November 6, the suspension of the law will expire thirty days thereafter, or on December 6, 2012. *See* Art. XVI, § 2; *see also* Art. XVI, §5(b) (requiring the Governor to "proclaim the results of the election" and declare the measure to have been

"adopted by the people of Maryland as a part of the laws of the State, to take effect thirty days after such election").

Although the period of suspension is expected to end on December 6, 2012, the Act itself provides that it "shall take effect January 1, 2013," 2012 Md. Laws, ch. 2, § 7, unless, at that time, litigation were pending "as to the validity or sufficiency of the signatures" required to petition the bill to referendum. *Id.*, § 5. There being no such dispute, same-sex marriage will be formally authorized under Maryland law at the stroke of midnight on New Year's Eve.

*Obtaining a Marriage License Under Maryland Law*

Although Chapter 2 amends Maryland law to allow for same-sex marriage, it will take effect within an existing statutory framework for the licensing of marriages, the provisions of which Chapter 2 "may not be construed to invalidate." FL § 2-201(a). Those provisions require that a couple seeking to marry under Maryland law must first obtain a license issued by the clerk of the circuit court for the county in which the marriage is to be performed. FL § 2-401(a); *see also* FL § 2-101(c) (defining "clerk"). In order to apply for a license, one of the parties to be married must appear before the clerk[2] and provide certain basic information about the parties, including their names, place of residence, age, and social security numbers, and whether the parties are related by blood or marriage, currently married, or, if married previously, "the date and place of each death or judicial determination that ended any former marriage." FL § 2-402(b). The statute does not now, and never has, included the parties' gender within the list of required information.

Although the circuit court clerks generally accept the representations made by the parties, under oath, in the application for a marriage license, *see* 25 *Opinions of the Attorney General* 120 (1940) *and* 18 *Opinions of the Attorney General* 346 (1933), the clerks are empowered to question the applicants about the information included within the application. "If, during the questioning of an applicant for a license, the clerk finds that there is a legal reason why the applicants should not be married, the clerk shall withhold the license unless ordered by the court to issue the license." FL § 2-405(e).

If, after questioning the applicant, the clerk determines that the applicants qualify to marry, the clerk may issue and deliver a license the same day that the application is made and, it is our

---

[2] In Cecil County, both parties to be married must "appear together before the clerk to apply for a license." FL § 2-402(e).

understanding, typically does so. *See* FL § 2-405(a). The license is not, however, immediately effective; unless the circuit court orders otherwise, the license does not become effective "until 6 a.m. on the second calendar day after the license is issued." FL § 2-405(d)(1). "For good cause shown," a judge of the circuit court for the county in which the application is made may authorize a license to become effective at a time "before the waiting period expires" if one of the parties to be married is either a Maryland resident or a member of the United States armed forces. FL § 2-405(d)(2). Once issued, the license is valid for six months, FL § 2-406(b), during which time "any authorized official"—an official of a religious order, a judge, a clerk, or a "deputy clerk designated by the county administrative judge of the circuit court for the county," FL § 2-406(a)(2)—may perform the ceremony. Under Maryland law, it is the ceremony, and not the license, that validates the marriage. *Feehley v. Feehley*, 129 Md. 565, 570 (1916) ("The regulative purposes of the license statute are useful and important, but they are sought to be enforced by pecuniary penalties pronounced against those officiating at unlicensed marriages, and not by the radical process of rendering void and immoral a matrimonial union otherwise validly contracted and solemnized."); *see also* 75 *Opinions of the Attorney General* 90, 92-94 (1990).

### *The Genesis of this Opinion Request*

Prior to the enactment of Chapter 2, the fact that same-sex marriage was not authorized under § 2-201 meant that there was a "legal reason" why same-sex applicants "should not be married," which prohibited the issuance of a license under § 2-405(e). *See* 57 *Opinions of the Attorney General* at 72 (construing a prior version of § 2-405(e) and concluding that, because there is a "legal impediment" to same-sex marriage, clerks are "prohibited from issuing a license"); *see also* Letter from Gloria Wilson Shelton, Assistant Attorney General, to All Clerks of Court (Feb. 24, 2004) ("Because a marriage between persons of the same gender is not legally valid in Maryland, the clerk is authorized by statute to withhold the issuance of a marriage license to persons of the same gender."). The enactment and approval of Chapter 2 removed the "legal reason" why same-sex couples should not be married. Accordingly, after January 1, 2013, a same-sex couple will be entitled to apply for, and obtain, a marriage license and solemnize their marriage in a civil ceremony in the same manner as other Maryland couples.

The voters' reported approval of Chapter 2 prompted several inquiries to the clerks of the circuit courts about the implementation of Maryland licensing requirements under the new law. Specifically, several same-sex couples have inquired as to how soon they can submit an application, obtain a license, and be married under Chapter 2. In addition, other questions have

arisen about whether couples who have already entered into an out-of-state union may obtain a marriage license here in Maryland and about the vows the clerks are to recite when conducting same-sex marriage ceremonies. The clerks of the various circuit courts have compiled the questions they received and have referred them to the Administrative Office of the Courts, which subsequently referred them to us for our opinion.

## II

## Analysis

The questions presented in your request relate to three broad topics: (1) the timing of the process of applying for and issuing a marriage license; (2) the ability of couples already joined in out-of-state unions to obtain marriage licenses and be married in Maryland; and (3) the form of the vows for same-sex marriage ceremonies. We shall address them in that same grouped manner.

### A. *Questions About the Timing of the Application for, and Issuance of, Marriage Licenses for Same-Sex Couples Under Chapter 2*

Your first group of questions relates to the processing and issuance of marriage licenses for same-sex couples and asks whether and to what extent clerks may begin accepting, processing, and issuing licenses in advance of the January 1, 2013 effective date of Chapter 2. As we will discuss below, we conclude that the licensing statute, properly construed to advance the public policies that lie behind it and behind Chapter 2, allows the clerks to begin accepting and processing license applications for same-sex couples prior to January 1, 2013, and even to issue licenses prior to that date under certain conditions. We acknowledge that the legal basis for doing so is not free from doubt and that an alternative reading of the Act that would have the clerks decline to take any action on a license application from a same-sex couple prior to January 1, 2013, would also be permissible. We believe that this is an administrative decision that must necessarily be left to the clerks and, to some extent, the circuit court judges that oversee their administration of the marriage laws. However, since the authorization of same-sex marriage is now established as the clear public policy of the State, it is important that such administrative judgments be made in a manner that facilitates same-sex marriage to the same extent that administrative judgments would be made to facilitate opposite-sex marriages.

1. *On what date can a clerk begin taking applications for marriage licenses for same-sex marriages?*

The statute does not prescribe when a marriage license application may be submitted or any date by which it must be acted upon by the clerk. Although the clerk may issue and deliver a marriage license on the same day the application is submitted, the statute does not require the clerk to do so. And in 1961, Attorney General Thomas B. Finan advised that, unlike marriage licenses, the General Assembly had specified no expiration date for applications. 46 *Opinions of the Attorney General* 44 (1961); *see also* 26 *Opinions of the Attorney General* 266 (1941) (observing that there is "no limitation upon the time within which an applicant must secure a marriage license after making application therefor"). For example, we previously concluded that, in a situation where a minor applied for a license but failed to provide the required written parental consent along with the application, "the consent need not be filed at the time the application is made but may be filed at any time before the license is actually issued," and that "[u]ntil a license is actually issued all that is necessary for you to do is to retain the original application in your files." 24 *Opinions of the Attorney General* 191 (1939).[3]

We see nothing in the statute, as amended by Chapter 2, that would cause us to depart from the conclusions we previously have reached. Just as a clerk may process and retain an application pending receipt of a necessary parental consent, a clerk who wishes to accept, process, and retain a marriage license application submitted by a same-sex couple in anticipation of the effective date of Chapter 2 may do so.[4] We see no statutory

---

[3] In 1963, legislation was passed that authorized the clerk to "destroy" an application if the parties had not picked up the license within 90 days after they filed their application. 1963 Md. Laws, ch. 191 (*codified at* Art. 62, § 7A (1972 Repl. Vol.) *and subsequently recodified at* FL § 2-405(j) (1999 Repl. Vol.)). The 1999 legislation that amended the law to allow for the same-day issuance and delivery of marriage licenses repealed this provision, which presumably was rendered unnecessary by the "one-stop shopping for marriage license applicants" the 1999 legislation authorized. *See* Senate Judicial Proceedings Committee, Floor Report, Senate Bill 282 at 2 (1999). Consequently, there is once again no expiration date for applications.

[4] As discussed above, the effect of Chapter 2 is suspended until the Governor formally proclaims that it has been approved by a majority of voters. *See* Art. XVI, §§ 2, 5. To insure against the theoretical possibility of a miscount or other circumstance that would result in the legislation not becoming effective on January 1, 2013, we suggest that clerks wait until the Governor's proclamation before accepting applications. However, because clerks "act in a ministerial capacity in issuing the marriage licenses," 25 *Opinions of the Attorney General* at

(continued…)

obstacle to clerks conducting the ministerial process of generating a signed application prior to the effective date of the bill and holding it until such time as the license can be issued.

### 2. *On what date can a clerk begin issuing marriage licenses for same-sex marriages?*

We believe clerks may begin issuing same-sex marriage licenses at any time after the Governor formally proclaims that Chapter 2 has been approved by the voters, which we would expect to occur on or about December 6, 2012. Although there is a "legal reason" why same-sex couples cannot be licensed to marry before midnight on January 1, 2013, FL § 2-405(e), there is no such legal reason why they should not be licensed to marry at any time after the moment the law takes effect. Accordingly, any licenses for same-sex marriages that the clerks issue prior to January 1, 2013, must bear an effective date of no earlier than January 1, 2013. Issuance of licenses in this fashion is not barred by § 2-405(e).

The provisions of the statute relating to the timing of the license process similarly do not bar clerks from issuing licenses with a January 1, 2013 effective date.[5] Section 2-405(h)(1) provides that a clerk "may not predate an application for a license," but does not in any way prohibit the clerk from including a subsequent effective date on the license itself. Section

---

120, we see no legal obstacle to their accepting applications in anticipation of Chapter 2's January 1 effective date in order to alleviate what may otherwise be the heavy administrative burden of processing an anticipated high volume of applications, as other jurisdictions have done. *See*, *e.g.*, News from the Blue Room, "Mayor Bloomberg, Speaker Quinn and New York City Clerk McSweeney Announce Public Lottery For Any Couple Wishing to Marry on Sunday, July 24th" (July 19, 2011) (*available at* http://www.nyc.gov/portal/site/nycgov/menuitem.c0935b9a57bb4ef3daf2f1c701c789a0/index.jsp?pageID=mayor_press_release&catID=1194&doc_name=http%3A%2F%2Fwww.nyc.gov%2Fhtml%2Fom%2Fhtml%2F2011b%2Fpr260-11.html&cc=unused1978&rc=1194&ndi=1 (last visited Nov. 15, 2012)) (describing how New York City began accepting applications for marriage licenses from same-sex couples on July 5, 2011—19 days before the effective date of the Marriage Equality Act—and expected to conduct a record number of marriages on July 24, 2011).

[5] It is our understanding that, as a technical matter, clerks can issue licenses with a delayed effective date. Although the computer program the clerks commonly use to prepare marriage licenses automatically generates a license with an effective date of 6:00 a.m. on the second calendar day after it is issued, the program can be overridden to insert another effective date.

2-405(d)(1) specifies that "a license is not effective until 6 a.m. on the second calendar day after the license is issued," but it does not expressly prohibit licenses becoming effective *after* that time.[6] *See Keppel v. Tiffin Sav. Bank*, 197 U.S. 356, 378 (1905) (observing that the word "until" means "to the time of, or up to"); *Black's Law Dictionary* (6th ed. 1990) (defining "until" as "Up to time of" and as "[a] word of limitation, used ordinarily to restrict that which precedes to what immediately follows it, and its office is to fix some point of time or some event upon the arrival or occurrence of which what precedes will cease to exist."). And while the statute provides a mechanism for authorizing a license to become effective at a time "before"—but not after—the two-day period expires, FL § 2-405(d)(2), that does not necessarily indicate a legislative choice to forbid the practice of issuing licenses with an extended waiting period. Rather, the policies that lie behind the establishment of a waiting period for marriage licenses suggest the opposite.

The purpose of the two-day waiting period is to provide the couple with a "cooling-off" period that will allow them to consider the significance of the step they are about to take. *See* Marriage License Requirements (*available at* http://marriage.laws.com/marriage-license-requirements (last visited Nov. 28, 2012)) (listing state waiting periods of one to six days, which "allow for a cooling-off period for the couple to determine if they truly wish to be married").[7] All of the timing provisions of the statute have as their goal the preservation of the waiting period. For example,

---

[6] The requirement that the license does not become effective until 6:00 a.m. on the second calendar day after its issuance was added in 1999, at the request of the Maryland Judicial Conference, to allow for the same-day issuance and delivery of licenses, either by mail or by pick-up at the courthouse. 1999 Md. Laws, ch. 336; Department of Legislative Services, Revised Fiscal Note at 2 (under the bill, "the clerk is authorized to issue and deliver a marriage license at the time an application for a license is made"). Prior to 1999, the statute provided for no delay of the effect of the license, but delayed the issuance of a marriage license for at least 48 hours after receipt of the *application*. *See* FL § 2-405(d) (1999 Repl. Vol.). Neither version of the law prohibits the issuance of a license with a delayed effective date.

[7] As a historical side note, the General Assembly first enacted a waiting period in an effort to address the unseemliness caused by the "marriage mills" of Elkton and other areas, where non-residents took advantage of Maryland's relatively liberal marriage requirements to obtain a license, get married, and immediately leave the State—all in the same day. *See generally State of Maryland v. Clay*, 182 Md. 639, 642-44 (1944); 27 *Opinions of the Attorney General* 253 (1942). A variety of adjustments to the waiting period requirement ultimately addressed the "evil" created by the practice. *See generally Clay*, 182 Md. at 644-45.

clerks may not predate an application to eliminate the waiting period, FL § 2-405(h)(1), and may not waive the waiting period on their own. The circuit court may reduce the waiting period, but only "[f]or good cause shown," FL § 2-405(d)(2), and then only if one of the parties to be married is a Maryland resident or a member of the military. These provisions restrict the *shortening* of the waiting period, not the extension thereof.

We do not mean to suggest that clerks or the circuit courts have the power to impose a longer waiting period over the couple's objection. The imposition of an extended waiting period in those circumstances would appear to be designed to discourage marriages between certain types of couples, which we believe is a substantive power inconsistent with the "ministerial" role the clerks have when issuing marriage licenses. *See 25 Opinions of the Attorney General* at 120. Nor do we mean to suggest that clerks may issue licenses with delayed effective dates to accommodate the mere *possibility* that the legal reason why the couple should not be married will be resolved prior to marriage. Licenses issued after the formal proclamation that the voters have indeed approved Chapter 2, with an effective date simply copied from Chapter 2, and at the couple's request, present no such difficulties.[8] Thus, it is our view that same-sex marriage licenses may be issued prior to January 1, 2013, so long as they carry an effective date no earlier than January 1, 2013.

The conclusion we reach is not the only permissible manner of implementing the requirements of the statute. The clerk of a circuit court may choose for purely administrative reasons not to

---

[8] In this respect, we distinguish the instances in which this office has advised against the issuance of licenses when the resolution of the legal impediment is not inevitable, as it is here. *Cf.* 19 *Opinions of the Attorney General* 335, 336 (1934) (clerk must refuse to issue a license when one of the parties has an existing marriage); 57 *Opinions of the Attorney General* at 72 (same-sex couple, as of 1972). We also distinguish 14 *Opinions of the Attorney General* 167 (1929), in which this Office advised that a clerk may refuse to issue the license when independent information indicates that the parties are not of legal age—an impediment to marriage that admittedly is not permanent. Unlike the situation addressed in this Opinion, minors are considered incapable of mature consent to marriage and, thus, equally incapable of requesting the licensing accommodation we describe. *See*, *e.g.*, *Sophanthavong v. Palmateer*, 378 F.3d 859, 877 (9th Cir. 2004) ("Because of this immaturity, juveniles' ability to participate in various activities (such as operating automobiles or serving on a jury) or to make decisions for themselves (regarding matters such as marriage or undergoing medical procedures) are restricted by law.") (citing *Stanford v. Kentucky*, 492 U.S. 361, 395 (1989)); *see also Auclair v. Auclair*, 127 Md. App. 1, 13 (1999) ("As minors, children are not legally competent to act on their own behalf.").

issue licenses until January 2, 2013,[9] which would make the licenses effective at 6 a.m. on Friday, January 4, 2013. Or the clerk could choose to process license applications immediately and prepare a license with a January 1, 2013 effective date, but hold the licenses until January 1, 2013, when they could be handed out to couples as they arrive at the courthouse (assuming the court remained open for the occasion). For couples in which one of the parties is either a Maryland resident or a member of the military, the circuit court could "sign an authorization" allowing the license to become effective immediately. FL § 2-405(d)(2). Implementing the statute in this manner would allow couples to be married on January 1, 2013, but would require a court order.[10]

We acknowledge that our conclusion might result in different administrative practices in different circuit courts. For instance, a circuit court in one jurisdiction may anticipate a high volume of applications from couples wanting to marry on January 1, 2013, and may wish to use the time before then to spread out what would otherwise be an unmanageable administrative burden. Other jurisdictions may determine that such advance processing is not necessary in order to issue licenses promptly after the effective date. We believe the legislative scheme allows for this type of administrative flexibility.

It is important in this respect to recall the limited role that marriage licenses play within the regulation of marriage under Maryland law. The license serves primarily as *evidence* of the marriage; the clerks maintain a properly indexed "marriage license book" that contains a complete record of the license, the applicants' eligibility therefor, and the date of the marriage ceremony. *See generally* FL § 2-501. For religious officials or lay officiants, the license serves to insulate them from potential liability under the statute that flows from performing a marriage

---

[9] Because January 1, 2013, is a legal holiday, the clerk's office will not be open "unless otherwise prescribed by the judge." Md. Code Ann., Cts. & Jud. Pro. § 2-204; *see also* 24 *Opinions of the Attorney General* 513 (1939) (advising a clerk that "[y]ou are not required to conduct the business of your office from your home and since the law does not require you to keep your office open on [a legal holiday], you are not required to conduct any of the business of your office on [a legal holiday]").

[10] We note that this is roughly the procedure followed by New York City to accommodate the large number of same-sex couples wishing to be married on the effective date of that state's Marriage Equality Act. *See*, *e.g.*, News from the Blue Room, *supra* at 79, n.4; *see also* New York State Bar Assn., "New York Marriage Equality, Frequently Asked Questions (FAQ), FAQ #1 at 2 (July 18, 2011) (*available at* http://www.nysba.org/Content/NavigationMenu62/MarriageEquality/NYMarriageEquality-QAs.pdf. (last visited Nov. 16, 2012)).

ceremony without a license. *See* FL § 2-406(e). The license does not, however, validate the marriage. *Feehley*, 129 Md. at 570; *see also Picarella v. Picarella*, 20 Md. App. 499 (1974) (following *Feehley* to find the marriage valid despite fraud); 75 *Opinions of the Attorney General* 90, 92-94 (1990) (noting that "Maryland cases have held that failure to comply with certain other statutory requirements concerning marriage does not invalidate the marriage"). Rather, it is the marriage ceremony that validates the marriage and, with respect to same-sex marriages, the General Assembly has declared that such validation may occur beginning at the stroke of midnight on January 1, 2013, not 6 a.m. on January 4. *See Robey v. Broersma*, 181 Md. 325, 336 (1942) ("When the legislative body expressly declares that an Act shall take effect on a certain and reasonable date, the presumption is that it intended it to take effect on that particular date, and on no other."). We believe that the provisions of the statute relating to the "ministerial act" of issuing marriage licenses should be read to allow for the effectuation of that legislative intent. *Bd. of Educ. v. Marks-Sloan*, 428 Md. 1, 18 (2012) ("The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature.") (internal quotation marks omitted). Accordingly, it is our opinion that clerks may begin issuing same-sex marriage licenses with a January 1, 2013 effective date at any time after Chapter 2 is formally proclaimed to have been approved by the voters, which we expect to occur on December 6, 2012.

> ### 3. On what date can a clerk begin delivering issued licenses for same-sex marriages to the parties?

We believe our response to the previous question applies here as well. Although each word in a statute is presumed to have significance, and the General Assembly appears to use the terms "issue" and "deliver" to refer to two separate steps in the process of obtaining a marriage license, *compare* FL § 2-405(e) (addressing issuance) *with* § 2-405(f) (providing for delivery of the license in person or by mail), none of the timing restrictions arguably applicable to the issuance of a license applies to delivery. Accordingly, if clerks may issue a license, or a court orders the same, they may also deliver the license in the manner prescribed by § 2-405(f).

We observe, in this respect, that the significance of the term "delivery" has diminished over time. Prior to 1999, the statute provided that the clerk could not "deliver" the license until 48 hours after an application had been made. *See* FL § 2-405(d) (1999 Repl. Vol.). The 1999 amendments, however, removed the two-day waiting period for issuance and delivery of the license, and instead made the license *effective* two days after issuance. Thus, although the statute currently contemplates issuance and delivery to be separate and distinct steps, delivery is now an

entirely administrative task which can be effectuated either "personally or by mail to" one of the parties or their designee. FL § 2-405(f).

> 4. *If licenses may be issued earlier than January 1, 2013, how do the provisions for the waiting period in FL § 2-405(d) apply to those licenses? For example, would a license issued on December 28, 2012, or earlier take effect at 6:00 a.m. on January 1, 2013, or at 6:00 a.m. on January 3, 2013 (i.e., 6:00 a.m. on the second calendar day after same-sex marriage became legal)?*

We believe that this question is also answered by our response to question no. 2 above. Issuance of licenses with a delayed effective date renders moot any questions about how the two-day waiting period is applied since the waiting period will, in effect, be longer than the statute requires. Whether issued on December 28 or December 8, a license issued in the manner we describe (*i.e.*, with a specified effective date of January 1, 2013) would become effective on January 1, 2013, as the statute's effective date allows.

Should the clerk elect to issue licenses without specifying a delayed January 1, 2013 effective date, he or she may not issue the license prior to December 30, 2012, in the absence of a court order. Taking the example you provide, a license issued on December 28, 2012, without a specified effective date of January 1, 2013, would presumably take effect at 6:00 a.m. on December 30, 2012, because the provisions of § 2-405(d) are not affected by the new law. That would result in a couple holding an effective same-sex marriage license prior to the date same-sex marriage is recognized as valid here in Maryland, something that we do not believe would be permissible without a court order under § 2-405(e).

## B.   *Questions Concerning Re-Marriage*

The next set of questions you pose relates to the circumstances under which couples who have previously entered into a union—whether it be a domestic partnership, a civil union, or a same-sex marriage—in another state may obtain a marriage license and be married here in Maryland without first dissolving their previous union.

> 5. *If a same-sex couple has already been married in a state where it was legal prior to January 1, 2013, and that marriage remains intact, can they now get a license and marry in Maryland?*

Just as opposite-sex couples may not get a marriage license in Maryland if already legally married in another state, same-sex couples may not either. In an opinion issued in 1940, Attorney General William Walsh advised that a license may not be issued to a couple who had previously been married by a justice of the peace in Virginia and who subsequently wanted to be married in a religious ceremony in Maryland. 25 *Opinions of the Attorney General* 353 (1940). The first ceremony, held in Virginia, was sufficient under the law of that state and, thus, "would be recognized here as a valid marriage." *Id*. at 354. Because "the marital status of both the parties would appear in the application as 'married', and there would be nothing in the record to show that they were married to each other, or that they had been divorced," no license could be issued. *Id*.; *see also* 24 *Opinions of the Attorney General* 507 (couple who wished to be married in two separate ceremonies conducted by ministers of different denominations need not obtain two licenses). This view was also adopted in a letter to Shirley P. Hill, Chief Deputy Clerk in Prince George's County from Catherine M. Shultz, Assistant Attorney General, dated July 11, 1984, advising that the Clerk should not issue a license to a married couple who wish to "reaffirm" or "solemnize" their marriage vows.

We see no reason why this advice does not remain valid and, therefore, we conclude that a same-sex couple who has already entered into a valid out-of-state same-sex marriage may not now obtain a license and marry again in Maryland. Out-of-state same-sex marriages, valid in the state where entered into, are recognized as valid under Maryland law. *See Port v. Cowan*, 426 Md. 435 (2012), *see also* 95 *Opinions of the Attorney General* 3 (2010). As "[a]n existing marriage," a previous out-of-state same-sex marriage "operates to prevent a subsequent marriage, and where it appears from the examination which the Clerk is required to make under [the forerunner of § 2-402(b)], that there is an existing marriage, it is the duty of the Clerk to refuse to issue the license until ordered to do so by the Court of which he is the Clerk." 19 *Opinions of the Attorney General* 335, 336 (1934).

> 6. *To the extent the Attorney General has previously opined or advised that a couple already married cannot get a license, would that conclusion still apply in this situation, where a couple could not previously be married in Maryland, and does Maryland's recognition of out-of-state same-sex marriage affect this determination?*

As discussed above in response to the previous question, same-sex couples who were legally married in other states prior to the adoption of same-sex marriage in this State remain legally married and, thus, unable to obtain a license under Maryland law. The enactment of Chapter 2 of 2012 does not change this conclusion.

Chapter 2 states that "[o]nly a marriage between two individuals who are not otherwise prohibited from marrying is valid in this State." As discussed above, parties to an existing valid marriage—whether entered in Maryland or out of state—are prohibited from marrying in Maryland, at least without first obtaining a divorce. *See* 19 *Opinions of the Attorney General* at 336: *see also* Letter from Julia M. Freit, Assistant Attorney General, to All Clerks of Court (Oct. 31, 1994) at 3, n.3 (concluding that a "couple may not obtain and use a new license in Maryland if they already are married under the laws of the state where the previous marriage occurred").

The fact that same-sex couples were legally prohibited from marrying in Maryland prior to the enactment of Chapter 2 does not change our conclusion. We understand that, prior to enactment of Chapter 2, many Maryland same-sex couples may have wished to marry in Maryland, but were compelled to travel to other states to be married because of Maryland's prohibition on same-sex marriage. But the rule of law barring parties married in one state from marrying again in another does not rest on the premise that the parties could have been married in the state of their choice the first time around. Rather, it rests on the concern that a person, if marrying a new partner, would "have two legal spouses, each of whom could expect virtually the same obligations from him, such as spousal or child support, inheritance, and healthcare coverage." *Elia-Warnken v. Elia*, 972 N.E.2d 17, 21 (Mass. July 26, 2012). Accordingly, any same-sex marriage validly entered into in another state is recognized in this State and its existence bars the parties from obtaining a new marriage license here in Maryland.

> 7. *If a couple entered into a "civil union" in a state allowing that contract, and the civil union remains intact, is their marital status Married, Single, or some other status, and can they obtain a license to marry in Maryland?*

As noted above, Chapter 2 provides that marriages between two individuals who are not otherwise "prohibited from marrying" are valid in this State. Nothing in either current law or Chapter 2 prevents a marriage between parties who are already in a civil union entered into in another state. The Legislature, in enacting Chapter 2, did not address the legal effect of out-of-state (or in-state) civil unions and domestic partnerships on a same-sex couple's ability to marry in Maryland. Rather, it left in place the pre-existing language of § 2-402, which requires applicants for a license to state the "*marital* status of each party" and "whether either party was *married* previously, and the date and place of each death or judicial determination that ended any former *marriage*." FL § 2-402(b) (emphasis added). In the absence of language expressly prohibiting parties to a civil union or domestic partnership from entering into a Maryland marriage, a plain text reading of Chapter 2 would yield the conclusion that they may do so.

Although the provisions of the Family Law Article governing marriage do not address the effect, if any, of a prior civil union, Maryland's domestic partnership law, enacted in 2008, does. *See* 2008 Md. Laws, ch. 590. That law defines "domestic partnership" as a relationship between "two individuals" who:

> (1) Are at least 18 years old;
>
> (2) Are not related to each other by blood or marriage within four degrees of consanguinity under civil law rule;
>
> (3) *Are not married or in a civil union or domestic partnership with another individual*; and
>
> (4) Agree to be in a relationship of mutual interdependence in which each individual contributes to the maintenance and support of the other individual and the relationship, even if both individuals are not required to contribute equally to the relationship.

Md. Code Ann., Health-Gen. § 6-101(a) (2009 Repl. Vol.) (emphasis added). As the italicized paragraph provides, parties who are already in a marriage, civil union, or domestic

partnership may not form a new domestic partnership "with another individual," but apparently may do so with their existing partner.[11] The General Assembly did not include a similar provision addressing civil unions in Chapter 2, and also did not distinguish pre-existing civil unions between the same people who now wish to be married and pre-existing unions with third parties. That the Legislature evidently knew how to include such provisions suggests that their absence was intended, *see Chow v. State*, 393 Md. 431, 457-58 (2006), and that the parties to out-of-state civil unions would not be precluded from marrying in Maryland.[12]

The Attorney General of Connecticut reached a similar conclusion in an opinion concerning the effects of the decision in *Kerrigan v. Commissioner of Public Health*, 289 Conn. 135, 957 A.2d 407 (2008), which held that, under that state's Constitution,

---

[11] We acknowledge that, read in isolation, the term "another individual" could be read simply to refer to the fact that one enters into a marriage, civil union, or domestic partnership with another individual. If read in this way, this provision would mean simply that one cannot enter into a domestic partnership if one is already married or in an alternative union—arguably a reasonable outcome. This reading, however, renders the phrase "with another individual" mere surplusage, which canons of statutory construction caution us to avoid. *See Armstrong v. Mayor of Baltimore*, 409 Md. 648, 694 (2009) (stating that "one of the cardinal rules of statutory interpretation" is to "ensur[e] that 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory'") (*quoting Jackson v. State*, 408 Md. 231, 236-37 (2009)). More importantly, the definition begins with the reference to "two individuals," the clear implication being that "another individual" must refer to a *third* party. This is how the Register of Wills for Howard County has interpreted the provision. *See* Byron E. Macfarlane, Register of Wills, "Domestic Partner Inheritance Tax Exemption For Real Property (describing domestic partnership and stating that, in order to qualify, the parties cannot be "married or in a civil union or domestic partnership with someone else") (*available at* http://registers.maryland.gov/main/region/howard/Domestic Partner Inheritance Tax Exemption for Real Property Informational Guide.pdf (last visited Nov. 14, 2012)).

[12] We believe it clearer still that same-sex couples who previously entered into a *Maryland* domestic partnership may marry under Chapter 2. Whereas the rights and obligations that flow from civil unions under other states' laws might not be coterminous with the rights and obligations attendant to a Maryland marriage, the rights afforded domestic partners under Maryland law are a subset of those afforded married couples. *See generally* Health-Gen. §§ 6-201 through 6-203. Some states expressly provide for the merger of the two unions, *see* Conn. Gen. Stat. § 46b-38qq, rr; others do not, *see Elia-Warnken*, 463 Mass. at 31, 972 N.E.2d at 19 (discussing the lack of a merger provision in Vermont law).

same-sex couples had a right to marriage and not just a civil union. Op. Conn. Att'y Gen., No. 2008-019 (Oct. 28, 2008). The Connecticut Attorney General's Opinion concluded that the State would recognize the validity of out-of-state same-sex marriages and out-of-state civil unions—a result we believe would hold true in Maryland as well—but found that the existence of an out-of-state civil union would not pose an obstacle to marriage by the same parties. Although Connecticut law prohibited an individual from entering into a civil union if he or she is already married, the converse did not hold true: "[T]here is no law that requires a same sex couple to dissolve their civil union prior to marriage to each other." *Id.*

The Connecticut Attorney General did not opine on whether a same-sex couple would have to dissolve their civil union prior to marrying other partners, but the courts of other states have reached the conclusion that they would. In *Elia-Warnken*, the Supreme Judicial Court of Massachusetts held that a Vermont civil union must be dissolved before a party to that union may marry another person. The court found that civil unions in Vermont were equivalent to marriage in that they carried the same rights and responsibilities, and that refusing to recognize a civil union in this context would "be inconsistent with the core legal and public policy concerns articulated in *Goodridge [v. Department of Public Health*, 440 Mass. 309, 798 N.E.2d 941 (Mass. 2003)] and *[In re] Opinions of the Justices to the Senate[*, 440 Mass. 1201, 802 N.E.2d 565 (Mass. 2004)]." 463 Mass. at 33-34, 972 N.E.2d at 21. The court also noted that, if the civil union were not recognized and dissolved, plaintiff would "have two legal spouses, each of whom could expect virtually the same obligations from him, such as spousal or child support, inheritance, and healthcare coverage." *Elia-Warnken*, 463 Mass. at 34, 972 N.E.2d at 21; *see also Hunter v. Rose*, 463 Mass. 488 (Sept. 28, 2012) (reaching the same conclusion with respect to registered domestic partnerships from California).

Although Maryland does not have a statutory procedure for dissolving civil unions, and there are no reported Maryland cases on this issue, we think a Maryland court would recognize an out-of-state civil union within the context of a divorce proceeding. *See Dickerson v. Thompson*, 73 A.D.3d 52, 897 N.Y.S.2d 298, 299-301 (N.Y. App. Div. 2010), *cited with approval in Port v. Cowan*, 426 Md. at 453-54; *Alons v. Iowa Dist. Court*, 698 N.W.2d 858, 862 (Iowa 2005). Put another way, a couple who has entered into a civil union elsewhere and then a marriage in Maryland might need to dissolve both the union and the marriage in order to achieve a full "divorce." That possibility, however, does not bear on the clerk's authority to issue them a Maryland license.

Synthesizing the law in this developing area yields the conclusion that couples need not dissolve an out-of-state civil union to marry each other here in Maryland, but must do so if they wish to marry third parties. That appears to be the conclusion reached by others who monitor the development of these issues. *See* Equality Maryland, "We Won Marriage – Now What? Answers to Your Questions" (*available* at http://www.equalitymaryland.org (last visited Nov. 14, 2012)) ("As long as you wish to marry the same person that you entered into the civil union or domestic partner registry with, you can proceed with obtaining a marriage license in Maryland."). Nonetheless, we acknowledge considerable concern about the ramifications of this conclusion. Although allowing the parties to un-dissolved civil unions to marry one another does not involve the obvious difficulties that arise when the parties seek to marry third parties, it would still raise potentially difficult conflicts of law when trying to sort out the privileges and obligations that attend to the two unions. The same conflicting responsibilities concerning "child support, inheritance, and healthcare coverage" that prompted the conclusion in *Elia-Warnken* that the parties would have to dissolve their civil union prior to marrying third parties would apply with similar, if not equal, force when the parties wish to marry each other.

The resolution of these issues must necessarily depend on the specific attributes of civil unions formed under the laws of the state of origin. For example, Maryland courts may, as the Supreme Judicial Court of Massachusetts did in *Elia-Warnken*, recognize an out-of-state civil union "as the equivalent of marriage" when "the rights and obligations procured by those entering in a civil union were functionally identical to those of marriage." 463 Mass. at 35, 33, 972 N.E.2d at 21, 20; *see also* Op. N.J. Att'y Gen. No. 3-2007 (Feb. 16, 2007) (identifying the foreign same-sex unions that "closely approximate" either New Jersey civil unions or domestic partnerships and, thus, will be recognized as such in New Jersey). If the Maryland courts were to do so, the existence of the out-of-state civil union, recognized as a *marriage* under Maryland law, might call into question the validity of a second marriage. The determination of whether a particular out-of-state civil union so qualifies, however, must await a specific factual context. As to the marriage license issue you have raised, we think the better reading of Chapter 2 is that the Legislature did not intend to preclude couples who have entered into a "civil union" in another state from marrying here.[13]

---

[13] We note in this respect that the decision whether to issue a marriage license is not the appropriate context for resolving possible conflicts between Maryland's marriage laws and the civil union laws of other states. The clerks "act in a ministerial capacity in issuing the marriage licenses," 25 *Opinions of the Attorney General* at 120, and
(continued…)

### C. *Questions Concerning the Form that Wedding Vows Should Take Under Chapter 2*

Your remaining questions relate to the form of the vows that clerks and other authorized State officials, and the parties being married, recite to solemnize same-sex marriages. Specifically, you seek our opinion as to what form those vows should take. The statute provides little guidance; it provides that "[t]he county administrative judge of the circuit court of the county shall designate . . . the form of the marriage ceremony to be recited by the clerk or deputy clerk and the parties being married," FL § 2-406(f)(2), but it provides nothing to direct the administrative judges in their designation. Consequently, the form of the marriage vows to be performed by the clerks is left largely to the administrative judge's discretion.

The discretion to craft marriage vows is not, however, unbounded. Although we have been unable to find any case authority specifically governing the form of civil marriage vows, we expect that any *substantive* difference between the form of the vows used to join same-sex couples and those used to join opposite-sex couples could raise constitutional questions under Maryland law, which—as of January 1, 2013—will not distinguish between such marriages. By contrast, non-substantive nomenclatural differences would likely not raise such constitutional questions. This is not to say that words do not matter in how we characterize and solemnize same-sex marriages; they clearly do. *See*, *e.g.*, *Opinions of the Justices to the Senate*, 440 Mass. 1201, 1207 (2004) ("The dissimilitude between the terms 'civil marriage' and 'civil union' is not innocuous; it is a considered choice of language that reflects a demonstrable assigning of same-sex, largely homosexual, couples to second-class status."). But differences in terminology that are limited to the designation of the parties to the marriage—for example, "husband and husband" versus "husband and wife"—do not demean the parties or impair the integrity of the bond formed and, we believe, do not raise constitutional concerns as a result. With these principles in mind, we turn to the specific questions you pose.

---

just as they are "without authority to pass upon the various legal questions that may arise respecting the validity of a foreign divorce," *id.*, they are equally without authority to determine whether a civil union entered into the laws of a particular state is the equivalent of marriage here in Maryland.

8. *Should clerks use two sets of vows, one for traditional unions and one for same-sex unions, or should they only use the new vows composed for same-sex unions? In other words, may clerks' offices offer each couple the opportunity to select from a standard and alternative text (using "spouse" as standard and "husband and wife" as alternative)?*

9. *If the clerks may lawfully offer each couple the opportunity to select from a standard and alternative text for their marriage vows (using "spouse" as standard language, and offering "husband and wife" as an alternative), should this option be available to both opposite and same-sex couples?*

The statute and case law provide little guidance on what form the vows should take, which leaves the administrative judges of the circuit courts with a relatively free hand in crafting the ceremony. When they do so, however, we would recommend that the administrative judges be mindful of not characterizing one form of marriage vows as "traditional" or solemnizing marriages with language that could be seen as stigmatizing the union into which the parties enter. Using a single, gender-neutral set of vows for all couples would eliminate any possibility of discrimination, but it may disappoint opposite-sex couples who wish to hear the pronouncement of "man and wife," as well as same-sex couples who look forward to hearing themselves declared "husband and husband" or "wife and wife." We would instead recommend that the administrative judges offer all parties a choice of different terminologies or, better yet, the opportunity to choose exactly how they will be referred to in their vows. Leaving the nomenclatural decision to the parties themselves will ensure that all parties receive the ceremony they desire and, thus, remove any question of discriminatory effect.

## III

### Conclusion

In summary, our answers to your questions are as follows:

1. Clerks may begin taking applications for marriage licenses for same-sex marriages immediately.

2. Clerks, if they so choose, may begin issuing marriage licenses for same-sex marriages once the Governor proclaims that Chapter 2 has been approved by the voters, which is expected to be December 6, 2012, but such licenses must specify that they are

not effective until January 1, 2013. Ceremonies may be performed beginning on January 1, 2013.

3. Clerks may begin delivering issued licenses for same-sex marriages to the parties on December 6, 2012, if the licenses bear a January 1, 2013 effective date. If they do not so specify, the license may not be delivered until January 1, 2013.

4. If the clerk issues a license earlier than December 30, 2012, but with a January 1, 2013, effective date, the provisions for the waiting period in FL § 2-405(d) are subsumed by the much longer waiting period effectively established on the face of the license.

5. A same-sex couple who has already been married in a state where it was legal to do so prior to January 1, 2013, cannot now get a license and marry in Maryland as long as the out-of-state marriage remains intact.

6. The conclusion that a couple already married cannot get a license would still apply where that couple could not have previously been married in Maryland. Maryland's recognition of out-of-state same-sex marriage does not affect this determination.

7. In the absence of statutory language prohibiting the issuance of a marriage license to a couple who has entered into a civil union in another state, we see no obstacle to the issuance of a license in such situations. We recognize that the extent to which a civil union performed elsewhere has created rights and obligations that might run parallel to, or conflict with, those incident to a Maryland marriage poses novel questions. Nonetheless, in our opinion, the likelihood that such questions will arise in the context of such events as a divorce, death, or adoption does not create such absurd results that an exclusion of these couples from the right to marry in Maryland should be read into the statute. Whether a "civil union" entered into in a state allowing it would be recognized as a *marriage* in Maryland and, thus, bar a subsequent marriage, poses a different question, the answer to which depends on the specific rights and obligations of the civil union. That question cannot, however, be resolved within the marriage licensing context.

8. Although the Administrative Judge in each circuit retains considerable discretion over the form that the vows are to take, we recommend that the clerks offer each couple the opportunity to select from a variety of texts that allow them to specify how they wish to refer to themselves.

9. Although the clerks may lawfully offer each couple the opportunity to select from various sets of vows, the clerks and Administrative Judges must avoid labels such as "standard" and

"alternative" vows that would effectively stigmatize one set or the other.


                              Douglas F. Gansler
                              Attorney General


                              Adam D. Snyder*
                              Chief Counsel
                                  Opinions & Advice

* Assistant Attorneys General Kathryn M. Rowe and Stuart Cordish contributed significantly to the preparation of this opinion.


*Editor's Note:*

This opinion has been revised to correct certain citations and to substitute the term "two-day" for "48-hour" in describing the waiting period required under FL § 2-405(d)(1).